UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
UNITED STATES of AMERICA ex rel. PATSY GALLIAN; the STATES of ALABAMA, CALIFORNIA, CONNECTICUT, COLORADO, DELAWARE, FLORIDA, GEORGIA, HAWAII, ILLINOIS, INDIANA, IOWA, KANSAS, LOUISIANA, MARYLAND, MICHIGAN, MINNESOTA, MONTANA, NEVADA, NEW HAMPSHIRE, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH CAROLINA, OKLAHOMA, RHODE ISLAND, TENNESSEE, TEXAS, VERMONT, and WASHINGTON ex rel. PATSY GALLIAN; the COMMONWEALTHS of MASSACHUSETTS, PENNSYLVANIA, and VIRGINIA ex rel. PATSY GALLIAN; the DISTRICT of COLUMBIA ex rel. PATSY GALLIAN; and PATSY GALLIAN, Individually,

       Plaintiffs,

   v.

AMERISOURCEBERGEN CORPORATION, AMERISOURCEBERGEN SPECIALTY GROUP, and US BIOSERVICES CORPORATION,

       Defendants.
-----------------------------------------------------------------x

ORDER

1:16-cv-2458 (ENV) (LB)

VITALIANO, D.J.

  Plaintiff-relator Patsy Gallian, a former reimbursement manager at defendant US Bioservices Corporation ("US Bio"), brings this *qui tam* action against her former employer, as well as against US Bio's parent companies, AmerisourceBergen Corporation and AmerisourceBergen Specialty Corporation, contending that, in connection with their provision of medications to patients covered by the Medicare and Medicaid programs, defendants fraudulently overbilled the government, manipulated their financial data to conceal such

1

overpayments, and submitted false attestations of compliance to the government, in violation of the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* (the "FCA"), and several state analogs.

Defendants now move to dismiss the Second Amended Complaint pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure. Dkt. 66. For the reasons that follow, defendants' motion is granted.

Background

US Bio is a nationwide pharmacy that, among other things, provides prescription drug benefits to patients who are covered by government-funded health insurance programs including Medicare and Medicaid. Sec. Am. Compl., Dkt. 59, at 7–8.[1] Essentially, for its provision of such services, US Bio submits claims for reimbursement to government payors or government-related payors, and, after review and approval by a claim processor, is reimbursed by the government or government-related payors. *See id.* at 17–19. Additionally, as a Medicare and Medicaid service provider, US Bio is obligated to attest that its reimbursement claims to the government are accurate and in compliance with all program requirements. *Id.* at 19, 22–23.

Gallian began working at US Bio as a reimbursement manager in May 2009, and, in 2013, was promoted to a senior reimbursement manager, a role she remained in until June 2015, when her employment there ended. *Id.* at 29–30, 38. Over the course of, and as a result of, her employment there, she became familiar with defendants' "reimbursement policies and procedures," including "the various contracted billing rate agreements" between defendants and the various government and government-related payors for defendants' provision of Medicare- and Medicaid-related services. *Id.* at 30. As relator, Gallian comes to allege that, as early as 2009, she discovered that defendants knowingly submitted false claims to, and concealed

---

[1] All citations to pages refer to the Electronic Case Filing System ("ECF") pagination.

overpayments from, government entities in connection with reimbursements for prescriptions provided to individuals under government health programs. *Id.* at 8, 31, 33, 57.

Specifically, the operative complaint tells the story of six fraudulent practices employed by defendants in furtherance of their alleged submission of false claims to the government. First, Gallian claims that due to errors in how the payors interpreted the units of medication billed, which defendants intentionally exploited, the government would regularly pay defendants for, as an example, a 300-day supply of medication despite only receiving a 30-day supply. *Id.* at 32. Gallian says that after informing her supervisor about this practice, her supervisor said she would discuss it with US Bio's IT Department, but the issue was never resolved during Gallian's employment. *Id.* at 33. Second, plaintiff alleges that defendants would bill the government for medications for patients who no longer used those medications, including some who were no longer living, and that despite informing a company auditor, plaintiff was never told whether the issue was resolved. *Id.*

Third, Gallian says that, in yet another scheme, US Bio regularly and improperly billed government payors as a "long-term care pharmacy" in order to avail itself of materially higher reimbursement rates than were available to "retail pharmacies" for the same medications. *Id.* at 47–48. Gallian asserts that she informed several individuals at US Bio about this billing misrepresentation, that subsequent reports—excerpts of which she includes in her complaint—confirm her allegations, and that, to her knowledge, government payors were never notified of this practice or refunded money stemming from it. *Id.*

Fourth, Gallian claims that, rather than disposing of cancelled orders and refunding government payors, US Bio would restock the medication for re-sale and, in addition, did not issue a refund for "[m]any" of these payments to the original payor. *Id.* at 49. Just as for her

other allegations, Gallian claims that she informed US Bio's internal auditor of the practice, but was never advised whether it was discontinued. *Id.* at 49–50. Fifth, plaintiff alleges that US Bio submitted claims for repayment at rates higher than what were contractually agreed to between itself and government-related payors. *Id.* at 27–28. Lastly, Gallian alleges that US Bio would regularly check a patient's eligibility for a particular drug—a process that would create an order for purposes of checking the price of the drug—and that, rather than cancelling the order, US Bio would submit a claim for reimbursement and retain the erroneously charged payment. *Id.* at 50–51.

Gallian's complaint underscores her view that the misrepresentations in defendants' billing were intentional rather than negligent. The allegation that defendants filed false claims is, obviously, coupled *pro tanto* with a claim that defendants falsely certified their compliance with federal guidelines. *Id.* at 53–54. Additionally, plaintiff alleges that, in an effort to conceal these overpayments, defendants recoded funds owed to the government as "payer processing error[s]," such that when financial reports were reviewed by internal and external auditors, those credits owed to the government would be impossible to identify. *Id.* at 35–36. Gallian also claims that, rather than remitting such overpayments to the government, defendants would let the concealed overpayments sit for approximately 18 months before making an "adjustment" within the system to move the overpayments directly into defendants' revenue accounts. *Id.* at 38–40. Relator claims that she created a report to communicate her concerns to her supervisors and includes in her complaint a summary of an internal audit report, which Gallian claims confirms her allegations. *Id.* at 40–43.

On May 13, 2016, Plaintiff initiated this action on behalf of the United States and several states, Dkt. 1, all of whom ultimately declined to intervene, Dkt. 11; Dkt. 23. Plaintiff filed her

4

Second Amended Complaint on March 26, 2020, which defendants now move to dismiss.

## Standard of Review

Rule 12(b)(6) of the Federal Rules of Civil Procedure permits a party to move to dismiss causes of action that "fail[] to state a claim upon which relief can be granted." In deciding a Rule 12(b)(6) motion to dismiss, a court must "accept[] all factual allegations in the complaint as true, and draw[] all reasonable inferences in the plaintiff's favor." *Lundy v. Catholic Health Sys. of Long Island Inc.*, 711 F.3d 106, 113 (2d Cir. 2013) (quoting *Holmes v. Grubman*, 568 F.3d 329, 335 (2d Cir. 2009)). However, the tenet that all factual allegations contained in the complaint are assumed to be true is "inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009).

Generally, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter . . . to state a claim to relief that is plausible on its face." *Lundy*, 711 F.3d at 113 (quoting *Iqbal*, 556 U.S. at 678). However, FCA claims sounding in fraud are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b). *See United States ex rel. Chorches for Bankr. Estate of Fabula v. Am. Med. Response, Inc.*, 865 F.3d 71, 81 (2d Cir. 2017). Rule 9(b) requires that, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). As explained more fully below, generally, "[t]o satisfy Rule 9(b)'s particularity standard, a plaintiff must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *United States ex rel. Gelbman v. City of New York*, 790 F. App'x 244, 247 (2d Cir. 2019) (quoting *Chorches*, 865 F.3d at 81).

Discussion

As the background facts suggest, Gallian's complaint as relator casts a wide net. Recapitulating, the Complaint asserts that defendants violated FCA by (1) knowingly filing false claims for reimbursement; (2) creating and maintaining false records in connection with their submission of false claims to the government (3) falsely certifying, through their submission of Medicare and Medicaid enrollment forms, compliance with federal mandates and guidelines; and (4) concealing, in their internal accounting records, such overpayments from the government. The Complaint also asserts analogous violations of state law.

1. Factually False Claims

At the core of her complaint, Gallian alleges that defendants systematically schemed to fraudulently overbill the government for its Medicaid- and Medicare-related services. "In FCA parlance, this is called a factually false claim," *United States ex rel. Hussain v. CDM Smith, Inc.*, No. 14 Civ. 9107 (JPO), 2017 WL 4326523, at *4 (S.D.N.Y. Sept. 27, 2017), and such a claim implicates FCA § 3729(a)(1)(A), which imposes liability upon a defendant that "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A). As made plain by the statutory language, the *sine qua non* of an FCA violation under this section is, of course, the submission of a false claim to the federal government. *United States ex rel. O'Toole v. Cmty. Living Corp.*, No. 17 Civ. 4007 (KPF), 2020 WL 2512099, at *10 (S.D.N.Y. May 14, 2020). Accordingly, to survive a Rule 9(b) motion to dismiss claims asserted under § 3729(a)(1)(A), a plaintiff "must plead the submission of a false claim with a high enough degree of particularity that defendants can reasonably identify particular false claims for payment that were submitted to the government." *Id.* at *9 (quoting *United States ex rel. Kester v. Novartis Pharms. Corp.*, 23 F. Supp. 3d 242, 260 (S.D.N.Y.

2014)) (internal quotation marks omitted).

While her Second Amended Complaint describes the various means by which defendants allegedly submitted false claims to the government, plaintiff, despite multiple bites at the apple, fails to identify, with any level of particularity, any specific examples of any false claims submitted to the government. *See id.* (granting a motion to dismiss a § 3729(a)(1)(A) claim where the operative complaint lacked "a single allegation of an actual false claim being submitted for reimbursement").

Seeking to blunt what would be a mortal attack, Gallian contends that she has identified specific false claims submitted to the government, *see* Pl.'s Opp'n, Dkt. 66-2, at 18 & n.25 (citing Sec. Am. Compl. at 27), and purports to cite, *inter alia*, an example of such a false claim for reimbursement related to defendants' provision of a medication named Carticel. Relator's assertion centers on what appear to be two lines of an internal company document. *See id.* The first line of this excerpt sets out several columns including "veterans name[,]" with the rest of the category blacked out, "veterans ID[,]" "service date[,]" "amount paid[,]" "interest paid[,]" "interest rate[,]" and finally, "CPT code[.]" Sec. Am. Compl. at 27. Below each column is corresponding information, but plaintiff zeroes in on the number "73,008.00" in the "amount paid" column. *See id.* Attempting to contextualize this number, plaintiff says that while the usual and customary rate for Carticel was $70,000 per treatment, the contracted rate with government payors was $35,000, and therefore contends that the document is proof that, instead of charging $35,000, defendants were charging roughly double the contracted rate per treatment. *See id.*

Gallian's evidentiary assertion is, however, quite hollow. Neither the record itself nor its accompanying contextual information shows any connection to an actual claim for

reimbursement made by defendants. *See United States ex rel. Joseph v. Brattleboro Retreat*, No. 13 Civ. 55, 2014 WL 3908432, at *8–9 (D. Vt. Aug. 10, 2014) (dismissing claim under § 3729(a)(1)(A) where "the [c]omplaint does not identify any specific claims submitted" but rather "mak[es] references to billing entries without identifying if and when these entries corresponded to actual claims"). For example, nowhere on the excerpt does the name Carticel appear, nor does the excerpt identify the particular government payor billed for the specific treatment. Courts in this circuit have recognized those details as critical in satisfying the Rule 9(b) standard; for example, one court granted a motion to dismiss as to claims regarding one group of drugs where "the Relator does not provide any factual basis to support his assertion that [defendant] actually caused any pharmacy to submit claims for [those drugs] to the government," and denied the motion to dismiss as to a different drug where the complaint provided "six examples of false claims and include[d] details such as the particular pharmacy billing the drug . . . [,] the particular drug billed . . . and, critically, the particular government programs that reimbursed [the pharmacy] for the prescriptions." *United States ex rel. Kester v. Novartis Pharms. Corp.*, No. 11 Civ. 8196 (CM), 2014 WL 2619014, at *8–10 (S.D.N.Y. June 10, 2014).

Furthermore, even if the contracted rate per treatment with the government was $35,000, the excerpt does not delineate how many Carticel treatments were connected to the amount paid figure, and therefore leaves the Court to speculate whether or not the amount charged actually should have been $35,000. In other words, it is not clear that this excerpt reflects an overpayment. *E.g.*, *Iqbal*, 556 U.S. at 679 ("[A] complaint [that] pleads facts that are merely consistent with a defendant's liability . . . stops short of the line between possibility and plausibility of entitlement to relief.").

Finally, even assuming that the excerpt does exemplify an overcharge to the government,

8

plaintiff fails to plead with sufficient particularity that compliance with the contracted Carticel rate was material to the government's decision to pay for the medication. *See United States ex rel. Foreman v. AECOM*, 19 F.4th 85, 105, 109 (2d Cir. 2021), *cert. denied*, 142 S. Ct. 2679, 212 L. Ed. 2d 764 (2022) (holding that "a materiality requirement" applies to "all claims brought under § 3729(a)(1)(A)" and that "[m]ateriality must also 'be pleaded with particularity under Rule 9(b)'") (quoting *Grabcheski v. Am. Int'l Grp., Inc.*, 687 F. App'x 84, 87 (2d Cir. 2017)). Indeed, if defendants' contract with the government established a $35,000 per-treatment rate for Carticel, then the government would have been aware of that fact, yet would still have paid a higher amount despite that knowledge. *See Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 195, 136 S. Ct. 1989, 2003, 195 L. Ed. 2d 348 (2016) ("[I]f the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material.").

This is not, at any rate, relator's only misstep. The Complaint, for example, does not allege whether defendants' noncompliance with the Carticel government rate was substantial, instead citing only a single, two-line excerpt from an internal document. *See Foreman*, 19 F.4th at 116 ("Materiality 'cannot be found where noncompliance is minor or insubstantial.'") (quoting *Escobar*, 579 U.S. at 194). To be specific, there are no allegations providing any estimate as to how often the government was overbilled for defendants' Carticel-related services, or the total amount that defendants overcharged the government with respect to the medication. In sum, even if plaintiff had sufficiently alleged the submission of a false claim—which, as discussed above, she has not—her allegations would still be inadequate, as she has failed to sufficiently allege that compliance with the contracted Carticel rate was material to the government's decision to pay for the medication. Accordingly, plaintiff has failed to plausibly allege the

9

submission of a false Carticel claim. *See United States ex rel. Gelbman v. City of New York*, No. 14 Civ. 771 (VSB), 2018 WL 4761575, at *6 (S.D.N.Y. Sept. 30, 2018), *aff'd*, 790 F. App'x 244 (2d Cir. 2019).

Plaintiff's other false claim allegations fare no better. For example, plaintiff claims that, by meddling with the billable units of medication they charged the government, defendants would submit reimbursement claims to the government for more supply than they actually provided. Sec. Am. Compl. at 32–33. But she does not cite a single example of that practice to support her allegations. *See* Pl.'s Opp'n at 38, 41 n.106, 47, 51 n.141. Plaintiff also describes a cancelled order scheme, contending that defendants charged the government for medication provided to patients who had died or were no longer prescribed the medication, and purporting to offer two examples in the form of an internal company spreadsheet. *See* Sec. Am. Compl. at 49–50. But nowhere on the excerpt is a government entity named, leaving the Court to speculate whether this internal spreadsheet reflects a false claim for reimbursement submitted to the government. *See id.*; *see also* Pl.'s Opp'n at 34–35. Plaintiff also claims that defendants would create a "live order" to check a patient's eligibility for a certain drug, but rather than closing the order, would charge the government. *See* Sec. Am. Compl. at 50–51. But, again, not a single example of this practice is included in the Complaint, much less pled in satisfaction of the heightened pleading requirements of Rule 9(b).

Then, spinning the tale of a still-deficient type of false claim, Gallian claims that defendants overcharged the government by improperly billing the government as a "long-term care pharmacy," thereby availing themselves of higher rates than were available for retail pharmacies. *See* Sec. Am. Compl. at 47–48. However, here too, relator fails to allege with the requisite particularity any false claims for reimbursement miscoded as such. Instead, she

complains merely that defendants were overpaid, by both commercial and government payors, approximately $20 million on a single drug, Sterlara, but includes no allegations as to how much of that number constitutes overpayments by the government, let alone any example of a Sterlara-related claim submitted to the government pursuant to an improper classification. *See id.* Furthermore, while plaintiff includes a table excerpted from an internal company email, which she says details approximately $50 million in overpayments by the government pursuant to inflated classification rates, nowhere does she identify a single claim submitted to the government where defendants classified their services incorrectly. *See id.* In short, all of plaintiff's false claim allegations suffer from the same deficiency: the absence of any example of a submission by defendants to the government of a false claim for reimbursement. *See Gelbman*, 2018 WL 4761575, at *6. Circumspectly, in fact, at other points in her briefing, plaintiff does not dispute that she "does not possess physical examples of [d]efendants' false claims to the United States." Pl.'s Opp'n at 18.

Interposed as a bulwark against dismissal is relator's argument that the Complaint complies with the pleading requirements under the Second Circuit's decision in *United States ex rel. Chorches for Bankr. Estate of Fabula v. Am. Med. Response, Inc.*, 865 F.3d 71, 81–82 (2d Cir. 2017). In *Chorches*, the Second Circuit observed that "Rule 9(b) does not require that every *qui tam* complaint provide details of actual bills or invoices submitted to the government," 865 F.3d at 93, and held that is permissible to plead, on information and belief, that fraudulent claims were actually submitted to the United States when the complaint (1) "make[s] plausible allegations that the bills or invoices actually submitted to the government were uniquely within [the defendants'] knowledge and control" and (2) "adduce[s] specific facts supporting a strong inference of fraud." *Id.* at 83 (internal quotation marks omitted).

11

But while relator's Complaint includes some allegations of a scheme to falsify records, it wholly fails to "set[] forth facts establishing specific reasons why [the] information [contained in] the particular bills that were submitted for reimbursement is peculiarly within [defendants'] knowledge." *Gelbman*, 790 F. App'x at 248 (quoting *Chorches*, 865 F.3d at 82) (first, second, and third alterations original). To illustrate, in *Chorches*, the Second Circuit emphasized the fact that the complaint's allegations demonstrated that the defendants' "billing procedures . . . made it virtually impossible for most employees to have access to all of the information necessary to certify on personal knowledge both that a particular invoice was submitted for payment and that the facts state to justify the invoice were false." 865 F.3d at 82. By contrast, Gallian failed to state any such facts, a "particularly noteworthy" admission, *Gelbman*, 790 F. App'x at 248, given her managerial position within the billing department, which, according to her Complaint, afforded her direct insight into the reimbursement policies and procedures by defendants, as well as the various contracted billing rate agreements between defendants and the government-related payors. *See* Sec. Am. Compl. at 29–30. In other words, "[p]laintiff's own [complaint] belies her argument," and makes clear that, while employed, she "would have had at least some access to specific information about submitted false claims." *O'Toole*, 2020 WL 2512099, at *9.[2]

---

[2] Gallian argues that *O'Toole* ignores the use of the present tense in *Chorches*, pointing to language in *Chorches* holding that, in order to "ensure that those who *can* identify examples of actual claims *must* do so at the pleading stage," 865 F.3d at 86 (emphasis original), a plaintiff must plead that the false claims are uniquely within a defendant's possession before it can avail itself of the relaxed 9(b) pleading standard. Plaintiff argues, essentially, that because she is no longer employed with defendants, she is no longer a relator that *can* identify examples of false claims, but only a relator that previously *could have* done so, and therefore that she should benefit from *Chorches*' saving grace. Pl.'s Opp'n at 30–31. However, the Second Circuit in *Chorches* did not base its decision to apply a relaxed pleading standard on the "effective[] terminat[ion]" of the relator's employment, *see id.* at 78, but on his inability to access the relevant information *during* his employment. *See id.* at 82–83. In any case, the Court declines to expand *Chorches*' narrow carveout to apply to all FCA plaintiffs who are no longer employed by the defendant, as plaintiff would have the Court do, particularly given that the *Chorches* court

12

Consequently, because the Complaint fails to identify any false claims submitted by defendants to the government—and is otherwise bereft of any allegations that the particular bills submitted for reimbursement are peculiarly within defendants' knowledge and control—plaintiff's factual falsity claim, set forth in Count 3, is not plausibly pleaded, and is therefore dismissed on that ground. *See Gelbman*, 790 F. App'x at 247–49 (affirming dismissal of claims under §§ 3729(a)(1)(A) & (B) where the complaint did not plausibly allege that defendants caused the submission of false claims to the federal government).[3]

   2. Legally False Claims

Gallian also asserts a claim under § 3729(a)(1)(A) interposing a "legal" falsity theory. In contrast to a claim of *factual* falsity, as the statute has been interpreted, a *legally* false claim relies on "a false representation of compliance with an applicable federal statute, federal regulation, or contractual term." *Foreman*, 19 F.4th at 104 n.7 (quoting *United States v. Kellogg Brown & Root Servs., Inc.*, 800 F. Supp. 2d 143, 154 (D.D.C. 2011)). In simple terms, a defendant that tells the government that it complied with a legal or contractual requirement when it, in fact, did not comply, files a legally false claim. *See id.* Somewhat complicating the analysis, legally false claims can be made under either "an *express* false certification theory" or "an *implied* false certification theory." *Id.* (emphasis added). "An express false certification

---

stated that its ruling was "[f]ully [c]onsistent with [prior Second Circuit p]recedents," *id.* at 89, and plaintiff points to none that supports her position.

[3] Plaintiff also lodges a claim under FCA § 3729(a)(1)(B), which imposes liability against anyone who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B). "Essentially, this subsection contains a 'double falsity' requirement—the plaintiff must plead both a false statement and a corresponding false claim." *Hussain*, 2017 WL 4326523, at *8. Simply, Gallian's (a)(1)(B) claim suffers from the same deficiency as her (a)(1)(A) claim: the failure to identify a false claim submitted to the government. Accordingly, her fourth cause of action, asserted under § 3729(a)(1)(B) of FCA, is also dismissed for the same reason as her (a)(1)(A) claim. *See Hussain*, 2017 WL 4326523, at *8 ("Courts generally treat [§§ 3729(a)(1)(A) & (B)] together, as their elements overlap significantly.").

occurs when a claimant explicitly represents that he or she has complied with a contractual condition, but in fact has not complied." *Id.* (quoting *Kellogg Brown*, 800 F. Supp. 2d at 154). Implied certification claims, in contrast, arise "where the defendant submits a claim for payment, impliedly certifying compliance with conditions of payment while omitting its violations of statutory, regulatory, or contractual requirements, and these omissions render the representations misleading." *Id.* (citing *Escobar*, 579 U.S. at 181).

As an initial matter, notwithstanding the heightened pleading requirement, plaintiff's complaint does not distinguish between express and implied certification. Instead, Gallian alleges that defendants "expressly and/or impliedly certified their compliance with applicable statutes and regulations." Sec. Am. Compl. at 54. "This lack of clarity alone is a basis to dismiss the legally false claims." *Gelbman*, 2018 WL 4761575, at *6. Struggling to restate her way out of vagueness, Gallian argues that—under either theory—she has plausibly alleged defendants' submission of legally false claims. *See* Pl.'s Opp'n at 40–41.

As best as can be deciphered, relator's express certification theory appears to rest on the inference that because a pharmacy such as US Bio that wishes to enroll in Medicare must submit, and periodically resubmit, certain forms that include attestations of compliance with federal rules, regulations, and guidelines, defendants must have done the same, even though, all the while, they were, in fact, not complying with the applicable rules. Sec. Am. Compl. at 16–24. Yet, Gallian fails to identify a single form submitted by defendants, let alone any details regarding when the submission occurred, who submitted the forms, if and how the forms were false, or whether defendants knew the attestations contained in the forms were false at the time of submission. *See United States ex rel. Bilotta v. Novartis Pharms. Corp.*, 50 F. Supp. 3d 497, 535–36 (S.D.N.Y. 2014) (rejecting express certification claim where it was unclear from the

14

complaint "when the certifications were submitted or whether they were submitted in connection with individual claims"); *United States v. Dialysis Clinic, Inc.*, No. 5:09 Civ. 710 (NAM) (DEP), 2011 WL 167246, at *15 (N.D.N.Y. Jan. 19, 2011) (dismissing express false certification claim where "plaintiff failed to allege that defendants knew" that the statements on the form were false "when they signed the form"). With respect to Medicare or Medicaid certifications a pharmacy might be expected to file to secure payment, the Complaint merely conclusorily asserts that "U.S. Bio made the above certifications to the [g]overnment on many thousands of claims without ensuring that all information being supplied was true, accurate, and complete." Sec. Am. Compl. at 25. In other words, the Complaint's specification rudimentarily identifies the kind of forms US Bio might be expected to file, but fails to specify the contents of any of those forms that US Bio *actually* filed, if any. *See* Sec. Am. Compl. at 17 ("Pharmacies who wish to enroll in Medicare must complete . . . Form CMS-855B"), 19 ("Once the health care provider, like Defendants, submits its CMS-1450 or CMS-1500 form to the Medicare claims processor, payments are typically made by Medicare directly to the provider"). The closest thing to a direct allegation regarding a form submitted by defendants comes when relator claims that, "[t]o become approved for electronic claims submissions, Defendants signed and submitted to CMS an Electronic Data Interchange ('EDI') Enrollment Form, which became effective when it was signed by Defendants' authorized person." *Id.* at 21. But this also fails to make any direct allegations regarding the details of the forms' contents or submission. In a vacuum in which the Complaint fails to plausibly allege that defendants falsely certified compliance with a statute or regulation as a condition to reimbursement from the government, the Complaint fails to state a claim under an express certification theory. *See Gelbman*, 2018 WL 4761575, at *7; *Hussain*, 2017 WL 4326523, at *6.

15

Gallian's legal falsity claim likewise fails under an implied certification theory. Again, implied certification claims rest on the idea that "when a defendant submits [or causes to be submitted] a claim, it impliedly certifies compliance with all conditions of payment." *Coyne v. Amgen, Inc.*, 717 F. App'x 26, 28 (2d Cir. 2017) (quoting *Escobar*, 579 U.S. at 180) (alteration original). Yet, as detailed above, plaintiff does not plausibly allege that defendants caused the submission of false claims to the government. Consequently, plaintiff's implied certification claims also fail. *See id.* at 29 (affirming 12(b)(6) dismissal of implied certification claim where plaintiff could not "connect his allegations to the submission of false claims").[4]

    3. <u>Reverse False Claims</u>

Relator's fifth and final cause of action asserted pursuant to FCA alleges a violation of § 3729(a)(1)(G). In contrast to an affirmative false claim, which involves submitting a false or fraudulent claim to the government for payment, a "reverse false claim" under § 3729(a)(1)(G) "creates FCA liability for false statements designed to conceal, reduce, or avoid an obligation to pay money or property to the Government." *Foreman*, 19 F.4th at 96 n.1 (quoting *United States ex rel. Lissack v. Sakura Glob. Cap. Mkts., Inc.*, 377 F.3d 145, 152 (2d Cir. 2004)).

Relator's reverse false claim theory merely echoes her already-rejected false claim theories. *See* Sec. Am. Compl. at 8, 25, 30, 33–35. Courts in this circuit have recognized that where a relator fails to "plausibly allege . . . the submission of false claims to the federal government," she necessarily also fails to "plausibly allege that [a defendant] had any obligation to repay to the federal government any funds it received." *Gelbman*, 790 F. App'x at 249–50;

---

[4] Gallian also asserts a § 3729(a)(1)(A) claim for fraudulent inducement. However, that claim rests on the same allegations underpinning her false certification claims. *See* Sec Am. Compl. at 52–53 ("Defendants fraudulently induced [the government] . . . by making certifications in the [a]pplications for each program"). Accordingly, plaintiff's fraudulent inducement claim fails for the same reasons that her false certification claims fail. *See Foreman*, 19 F.4th at 118 n.9.

16

*see also United States ex rel. Yu v. Grifols USA, LLC*, No. 17 Civ. 2226 (GHW), 2021 WL 5827047, at *12–13 (S.D.N.Y. Dec. 8, 2021). In particular, Gallian's rehashed references to decontextualized spreadsheet entries, Sec. Am. Compl. at 33–35, fail to plausibly allege that any billing entries correspond to government overpayments obtained through the submission of a false claim, or even that those entries correspond to governmental, as opposed to commercial, overpayments. *See Joseph*, 2014 WL 3908432, at *10. Gallian's § 3729(a)(1)(G) claim is therefore dismissed.

    4. Leave to Amend

Gallian has requested that, should the Court dismiss her Second Amended Complaint, she be granted leave to amend her complaint a third time. *See* Pl.'s Opp'n at 32 n.69. Overall, courts may deny leave to amend in cases of, among other things, "repeated failure to cure deficiencies by amendments previously allowed" or "futility of amendment." *Ruotolo v. City of New York*, 514 F.3d 184, 191 (2d Cir. 2008) (quoting *Foman v. Davis,* 371 U.S. 178, 182, 83 S. Ct. 227, 9 L. Ed. 2d 222 (1962)). Here, plaintiff has had multiple opportunities to cure the deficiencies in her complaint, including an opportunity after defendants filed their initial motion for a pre-motion conference, which outlined their arguments in support of dismissal. *See* Dkt. 54. Indeed, in support of her request for leave to amend here, plaintiff claims she wants to include "additional allegations specifying that" defendants' false claims are "uniquely in [their] possession and control." *See* Pl's Opp'n at 32 n.69. But that is precisely the same request plaintiff made in opposition to defendants' motion for a pre-motion conference, which she submitted *before* she ultimately filed her Second Amended Complaint. *See* Dkt. 55 at 2. In other words, plaintiff was on notice of her pleading deficiencies, yet failed to cure them. *See Ping Chen ex rel. U.S. v. EMSL Analytical, Inc.*, 966 F. Supp. 2d 282, 304–05 (S.D.N.Y. 2013).

Accordingly, the Court concludes that amendment is futile and that dismissal of Gallian's federal claims with prejudice is warranted.

     5.   State FCA Claims

The various state law False Claim Act causes of action set forth in the Second Amended Complaint also fail, but for a different reason and without prejudice. Controlling on this point is the protocol that encourages a district court to "decline to exercise supplemental jurisdiction over a claim" if "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). In cases like this, where the federal claims are dismissed at the threshold, the Second Circuit has made clear that the state claims should generally be dismissed as well, though such dismissal is not "absolutely mandatory." *Marcus v. AT&T Corp.*, 138 F.3d 46, 57 (2d Cir. 1998) (quoting *Baylis v. Marriott Corp.*, 843 F.2d 658, 665 (2d Cir. 1988)). Given this threshold dismissal of Gallian's federal claims, the Court declines to exercise supplemental jurisdiction over her remaining state law claims, which are dismissed without prejudice. *See, e.g.*, *United States ex rel. JDJ & Assocs. LLP v. Natixis*, No. 15 Civ. 5427 (PKC), 2017 WL 4357797, at *11 (S.D.N.Y. Sept. 29, 2017) ("Having dismissed [relator's] claims under the FCA, the Court declines to exercise supplemental jurisdiction over [relator's] state law claims."); *United States ex rel. Vierczhalek v. MedImmune, Inc.*, 345 F. Supp. 3d 456, 466 (S.D.N.Y. 2018), *aff'd sub nom. Vierczhalek v. MedImmune Inc.*, 803 F. App'x 522 (2d Cir. 2020).

Conclusion

In line with the foregoing, plaintiff has failed to adequately plead that defendants violated FCA, 31 U.S.C. §§ 3729 *et seq.*, and those claims are therefore dismissed against all defendants with prejudice.[5] Given this threshold dismissal, the Court declines to exercise its supplemental

---

[5] The remaining federal claims interposed in the Second Amended Complaint, to the extent not

jurisdiction over relator's state claims, which are therefore dismissed as to all defendants without prejudice and with leave to refile them in a state court of appropriate jurisdiction.

The Clerk of Court is directed to enter judgment accordingly and to close this case.

So Ordered.

Dated: Brooklyn, New York
December 11, 2022

/s/ Eric N. Vitaliano
ERIC N. VITALIANO
United States District Judge

---

addressed above, either are similarly without merit or else are moot, and are accordingly all dismissed with prejudice.